**IN THE COURT OF APPEALS OF IOWA**

No. 24-0907
Filed September 4, 2024

**IN THE INTEREST OF W.P.,**
**Minor Child,**

**Z.P., Father,**
        Appellant.
_____

Appeal from the Iowa District Court for Polk County, Brent Pattison, Judge.

A father appeals the termination of his parental rights over his child.
**AFFIRMED.**

Bryan Webber of Carr Law Firm, P.L.C., Des Moines, for appellant father.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Nicole Garbis Nolan of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

Considered by Schumacher, P.J., Buller, J., and Vogel, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**VOGEL, Senior Judge.**

After a young girl spent twenty-three of the past thirty months in foster care, the State moved to terminate her mother's and father's parental rights.[1] The father's rights were terminated under Iowa Code section 232.116(1)(h). He appeals, arguing he was sidelined as a parent while social workers focused on reunifying the mother and child and that the child can be returned to his custody. On our de novo review, we agree with the juvenile court. The father's criminal conduct and history of substance use kept him from caring for his child, and the child could not be placed in his custody at the time of the termination hearing. Because clear and convincing evidence supports termination, termination is in the child's best interest, and no statutory grounds impede termination, we affirm.

## I. Factual Background and Proceedings.

The child came to the attention of the Iowa Department of Health and Human Services (HHS) quickly after she was born in October 2021—the mother had a history of substance use and had recently resumed using methamphetamine. The child was removed from her mother's custody when she was six weeks old and placed with foster parents.

The father learned he was the child's biological father in early 2022 after court-ordered paternity testing. At the time, the father was on parole and conveyed willingness to participate in court services and parenting. However, that was short lived—he was sent back to prison in May 2022 after threatening to kill another

---

[1] The mother consented to the termination under Iowa Code section 232.116(1)(a) (2024). She does not appeal.

person in his work-release unit.  He remained in prison until April 2023, when he moved into a supervised, sober-living facility.

While the father was imprisoned, the mother made good progress toward sobriety.  Indeed, she received an extension in the child-in-need-of-assistance case in fall 2022 and was later reunified with the child in December 2022.  Yet in July 2023, the mother suffered a setback and the child was again placed with the foster parents.  In December 2023, the mother and child were again reunified, but only for a brief period.  Roughly two weeks later, the mother requested that the child be returned to foster care.  With the mother unable to meet the child's needs, the court again placed the child with foster parents in early January 2024.

All this time, HHS's reunification efforts largely focused on the mother.  Yet the father was also never able to care for the child.  As the juvenile court explained, "each time [the child] has been removed from [the mother], [the father] has been unable to step up as a custodian because he has been in some form of custody— first at the Fort, then in Prison, and finally in the supervised living program at Kingdom Living."  Still, the father asserted he was making progress toward his sobriety.

By March 2024, the child was still in foster care and the mother believed she could no longer provide the stability that the child needed.  Because of the child's prolonged placement in foster care,[2] and the parents' discrete inabilities to

---

[2] To put a finer point on it, the child was born in October 2021, placed with her foster family in November 2021, returned to her mother's custody in December 2022, placed with the foster family in July 2023, returned to her mother's custody in December 2023, and placed again with the foster family in January 2024.  The timeline of this case thus shows the child experienced significant instability during the first two and a half years of her life.

care for her, the State moved to terminate both the mother's and father's parental rights.

After a two-day termination hearing, held on March 25 and April 5, 2024, the district court terminated both parents' rights to the child. Relevant here, the court first noted that long-term sobriety remains a concern for the father. Though his progress while supervised was encouraging, the father has a history of relapsing after leaving supervised settings. At the time of the hearing, the father had only recently moved out of the supervised-living facility. Consequently, the father could not show any meaningful period of independent sobriety. To complicate matters further, the father became engaged to and began cohabiting with a woman with a similar history of substance use—who was using methamphetamine just months before the termination hearing.

Second, while the father marshaled several letters and witnesses in support of his progress, the court determined these letters and supportive witnesses were "less probative about whether [the father] is ready to care for [the child] full time," nor were they instructive for "what is in [her] best interests in the long term." Critically, "[m]ost of the letter writers have never met" the child. Nor did "some of the writers" know the father "had [a] prior child welfare case, that his prior children have not grown up in his custody, and that he had been unavailable to take custody of [the child] at every stage when he was needed in this case."

Finally, the child's therapist believed the child should stay with her foster parents. The therapist believed it would be "devastating" for the child to lose the connection with her foster family—the family she has been with "since she was just a few weeks old" and thus has "bonded with since she was a new infant."

The court terminated the father's parental rights under Iowa Code section 232.116(1)(h). Under that section, the court found the child was two and a half years old at the time of the hearing, had been in foster care "for 23 of the 30 months the case has been open," could not be placed in her father's custody, and that termination was in the child's best interest.

The father appeals, arguing the State failed to carry its burden under section 232.116(1)(h) and that termination does not serve his child's best interests.

**II. Analysis.**

**A. Termination under Iowa Code section 232.116(1)(h).**

We review proceedings terminating parental rights de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). The juvenile court's factual findings are nevertheless entitled to weight, as the trial court is in the best position to view witnesses and assess credibility. *Id.*

Iowa's three-step process to determine whether a parent's rights should be terminated is well established and familiar. We consider "(1) whether the State proved any grounds for termination, (2) whether termination is in the child's best interests, and (3) whether any exceptions save the parent–child relationship." *In re W.T.*, 967 N.W.2d 315, 332 (Iowa 2021). The State carries the burden to show by clear and convincing evidence that termination is proper under any ground within Iowa Code section 232.116(1) and that termination best serves the child. *Id.* Once the State meets its burden, parental rights will be terminated unless the parent establishes a statutory impediment to termination under section 232.116(3). *See id.* Throughout our analysis, the child's best interest remains the polestar. *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014).

The district court terminated the father's parental rights under Iowa Code section 232.116(1)(h). To terminate under this ground, the State must prove (1) the child is three years old or younger at the time of hearing; (2) the child had been previously adjudicated in need of assistance; (3) the child was "removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days"; and (4) "the child cannot be returned to the custody of the child's parents . . . at the present time." Iowa Code § 232.116(1)(h).

The father does not contest the first three elements. We therefore focus our inquiry on whether the child could have been returned to the father's custody at the time of the termination hearing. On our review, we agree with the juvenile court's thorough and thoughtful analysis of the father's circumstances.

As the court found, the father "deserves real credit" for his work upon release—participating in supervised living, maintaining sobriety, attending therapy, and garnering support from friends and family. Yet "even when one factors in those positive considerations," the State showed "clear and convincing evidence [the child] cannot be returned to his care."

The father has a long road to lasting sobriety. The father has never maintained consistent sobriety after leaving structured, supervised treatment settings. At the time of the termination hearing, he had only been living independently for a few weeks. Thus, he had not yet established the length of sobriety necessary to show the child could be safely returned to his custody. What's more, the district court recognized the father's path to sobriety is complicated by his recent engagement to "a woman who has her own substance

abuse history—as well as her own history of child welfare system involvement." The child's safety in the home would not just turn on the father's sobriety, but his new fiancée's sobriety as well. Importantly, the question is not whether the child could *someday* be returned to the father's custody, but whether she can be returned to her father's custody "*at the time of the termination hearing.*" *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (emphasis added). At the time of the termination hearing, the father had not yet demonstrated consistent, independent sobriety.

The father downplays these sobriety concerns on appeal—indeed he does not mention them at all. Rather, the main thrust of the father's appeal is that he was sidelined as a parent while HHS focused on reunifying the mother and child. He argues that he consistently requested and attended visitation and any lack of contact between the child and himself and his family was caused by HHS and the mother, not his circumstances.[3] We disagree.

When the father was initially on parole and learned of his child, he had an opportunity to be a parent. Instead, he threatened to kill another person and was sent back to prison. When the mother could not care for the child, it was the father's choices that excluded him as the child's next caregiver—his criminal involvement, his parole revocation, his supervised-living arrangement stemming from his history of substance use.

---

[3] The father also summarily invokes due-process and equal-protection rights under the United States and Iowa Constitutions. However, neither constitutional issue was ruled on below, nor does the father articulate which procedure he was unconstitutionally deprived of or how his equal-protection rights were violated. These issues are therefore both unpreserved and waived. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002); *State v. Louwrens*, 792 N.W.2d 649, 650 n.1 (Iowa 2010) (noting "passing reference to an issue, unsupported by authority or argument, is insufficient to raise the issue on appeal").

Moreover, the underlying child-in-need-of-assistance case with the mother and child was not rushed and did not preclude opportunities for the father to parent his child. In fact, the mother had progressed enough by the fall of 2022 that she was given an extension of time to work toward reunification. *See* Iowa Code § 232.104(2)(b). The father also benefited from this additional time to complete his prison sentence and work toward providing a safe environment for the child. Yet by the termination hearing in April 2024, the father was still not able to safely care for his child. Thus it was his own circumstances, not HHS's actions, that caused the child to spend twenty-three of the thirty months leading to the termination hearing in foster care.

As the district court noted, the father's progress is encouraging. However, he could not safely take custody of his child at the time of the termination hearing. We therefore agree the State proved the statutory ground for termination under section 232.116(1)(h).

**B. The Child's Best Interest under Section 232.116(2).**

The next step is determining whether termination is in the child's best interest. *W.T.*, 967 N.W.2d at 332. On appeal, the father conflates this inquiry with the third step, asserting termination does not serve the child's best interests because "there was a strong bond between the child and their father" and "it would be detrimental to the child to terminate that parent-child relationship." *See* Iowa Code § 232.116(3) (allowing an exception for termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The best-interest and statutory-impediment inquiries are not interchangeable—the State carries the

burden to show best interests, while the parent carries the burden to prove an impediment. *W.T.*, 967 N.W.2d at 322.

Even so, termination best serves the child. For this step, we primarily consider "the child's safety," "the best placement for furthering the long-term nurturing and growth of the child," and the child's "physical, mental, and emotional condition and needs" at the time of the hearing. Iowa Code § 232.116(2); *In re D.M.J.*, 780 N.W.2d 243, 245 (Iowa Ct. App. 2010). If a child has been with a foster family, we also consider whether the child "has become integrated into the foster family," and "[t]he length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining that environment and continuity for the child." Iowa Code § 232.116(2)(b)(1). At bottom, "juvenile law is not a fault-based edifice like tort law," and we strive "to keep children from languishing in foster care." *In re Z.P.*, 948 N.W.2d 518, 523 (Iowa 2020) (second quoting *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially)).

The termination hearing evidence shows the child is fully integrated into her foster family, who wish to adopt her. She first entered their care when she was six weeks old and has spent roughly two years in their care. It has been the only stability given to her in the bumpy road of back-and-forth placement with the mother. She has never been with the father outside of supervised visitations. Accordingly, "[t]his is exactly the sort of case where we must not deprive a child of permanency in the hope [the father] will get better." *In re W.M.*, 957 N.W.2d 305, 314 (Iowa 2021). We thus agree that termination is in the child's best interest.

**C. Statutory Impediments under Section 232.116(3).**

As for the father's raised statutory impediment to termination, he has not proved by clear and convincing evidence that we should forgo termination and permanency for the child because of a close bond. While he indeed argues that he loves his child and they share a bond, "the existence of a bond is not enough." *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021). Rather, the connection must be so strong that termination would harm the child. *Id.* Here, the child has never been in the father's care for more than fully supervised visits. Because the father has never progressed enough to have the child in his custody, the father has not shown a degree of connection that outweighs the child's need for permanency. *See W.M.*, 957 N.W.2d at 315. Thus, we affirm the termination of the father's parental rights over the child.

**AFFIRMED.**